George E. MERCIER and Susan Y.
Mercier, Plaintiffs, Appellants,

v.

SHERATON INTERNATIONAL, INC.,
a/k/a ITT–Sheraton International,
Inc., Defendant, Appellee.

No. 92–1050.

United States Court of Appeals,
First Circuit.

Heard June 3, 1992.

Decided Dec. 22, 1992.

James M. Hartman with whom Mary Ann Snyder and Harris, Beach & Wilcox, Rochester, NY, were on brief, for plaintiffs, appellants.

David S. Mortensen with whom Lydia J. Luz and Tedeschi, Grasso & Mortensen, Boston, MA, were on brief, for defendant, appellee.

Before BREYER, Chief Judge, O'SCANNLAIN,* Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Susan and George Mercier sued Sheraton International, Inc. ["Sheraton"] for breach of contract and intentional interference with contractual relations in connection with an alleged agreement to establish and operate a gambling casino at the Istanbul Sheraton Hotel. Sheraton moved for dismissal on the ground of forum non conveniens, asserting that Turkey is the more appropriate forum. The district court ordered dismissal. *Mercier v. Sheraton Int'l, Inc.*, 744 F.Supp. 380 (1990) ["*Mercier I*"]. On appeal, we concluded that several factors relevant to the forum selection inquiry had been misapplied. *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419 (1st Cir. 1991) ["*Mercier II*"]. On remand, the district court again ordered dismissal, imposing several conditions designed to ensure the availability of an adequate forum in Turkey.

## I

## BACKGROUND

In approximately 1982, George Bauer, general manager of the Istanbul Sheraton Hotel, began negotiations with Susan Mer-

* Of the Ninth Circuit, sitting by designation.

cier for the establishment and operation of a gambling casino in the hotel. At the time, Mercier, an American citizen, was operating a cruise ship casino. As foreigners doing business in Turkey were required to have Turkish partners, Bauer introduced Mercier to Fethi Deliveli, a Turkish national. Ultimately, Mercier and her father, George Mercier, formed a partnership with Deliveli and became stockholders in Lidya Turistik Tesisler Isletmesi ["Lidya"], a Deliveli family corporation from which the Merciers acquired the right to operate the proposed casino at the Istanbul Sheraton.

The casino negotiations continued throughout 1982 and 1983, eventually resulting in the execution of an undated Memorandum of Understanding among Bauer, Deliveli and the Merciers, whereby the Merciers and Deliveli would rent casino space in the Istanbul Sheraton. The agreement was made subject to the partners' procurement of all necessary permits from the Turkish government by the Merciers, and to the approval of Sheraton Corporation, Sheraton's Boston-based parent. Sheraton asserts that the Turkish permits were never obtained and that the approval of its parent corporation was never given; the Merciers disagree.

In March 1984, Bauer and Deliveli (representing Lidya) signed a Protocol entitling Lidya to install slot machines in the Sheraton casino space. The Protocol was conditioned on the Merciers' participation in Lidya and on the approval of gambling by the Turkish "owning corporation" from which the hotel premises were leased by Sheraton. The Protocol prescribed that its interpretation would be "governed by Turkish laws," and designated Istanbul as the proper forum for the litigation of disputes arising thereunder. Sheraton now contends that the Protocol was intended to supersede the earlier Memorandum of Understanding, and that the Protocol never went into effect because it was never approved by the Turkish "owning corporation."

Sometime during the summer of 1986, following the collapse of the Mercier–Deliveli partnership, the Merciers reconveyed their Lidya shares to Deliveli in return for 101 slot machines and accession to the rights of Lidya and Deliveli under their various agreements with Sheraton. The Merciers then began negotiations with Leisure Investments, P.L.C. ["Leisure"], with a view to forming a new partnership to operate the casino. At about this time, Susan Mercier left Turkey in the aftermath of an altercation with a Turkish national which eventually led to the issuance of a warrant for her arrest. Leisure broke off negotiations with the Merciers and, in October 1987, Leisure's wholly-owned subsidiary made a separate agreement with Sheraton, pursuant to which the Leisure subsidiary commenced casino operations at the Istanbul Sheraton in 1988.

## II

## PRIOR PROCEEDINGS

The Merciers filed the present action against Sheraton in the United States Court for the District of Massachusetts.[1] Sheraton answered and moved to dismiss on the ground of forum non conveniens, contending that the Republic of Turkey was the proper forum. In *Mercier I*, the district court concluded, based on the affidavit of Dr. Yucel Sayman, a Turkish law professor and attorney, that the Merciers would be able to raise their claims in the Turkish courts and that—despite Susan Mercier's legal entanglements—Turkey would provide an "adequate available forum." 744 F.Supp. at 384–85. The court further found that various "public interest" factors militated in favor of a Turkish forum, including the difficulty of applying Turkish law, the relative paucity of ties between the parties' dispute and the Commonwealth of Massachusetts, and the congestion in the federal district court docket. *Id.* at 386.

---

1. Their earlier lawsuit against Sheraton in the Western District of New York was dismissed because it mistakenly named Sheraton *Corporation* as defendant. Sheraton (a subsidiary of Sheraton Corporation), headquartered in Boston with most of its operations overseas, was not subject to the jurisdiction of the New York court.

In *Mercier II*, we concluded that the Sayman affidavit was too incomplete and conclusory tc meet Sheraton's burden of proving that the Turkish courts were an available "alternative forum" for the Mercier claims, 935 F.2d at 425–26 and n. 7. Moreover, assuming Turkey's *availability* as an alternative forum, we concluded that the *adequacy* of the Turkish forum had not been demonstrated, in that (1) the Merciers' tort claims might be time-barred under Turkey's one-year statute of limitations; and (2) Susan Mercier's testimony—which the district court considered "essential"— might not be received. *Id.* at 426. Finally, we noted several deficiencies in the district court's forum selection analysis. We noted in particular the apparent failure to *compare* the docket congestion in Turkey with the docket congestion in the forum and the failure to consider the potential interests of the United States, as well as the District of Massachusetts, in affording a forum for the litigation. *See generally id.* at 427–430.

We did not suggest that dismissal was foreclosed on remand, *see id.* at 430, but rather that the forum determination should be made only after further findings of fact. *See generally Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1552 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 430, 116 L.Ed.2d 449 (1991) (citing *In re Air Crash Disaster Near New Orleans, Louisiana*, 821 F.2d 1147, 1166 n. 32 (5th Cir.1987) (en banc)) (where district court sets forth insufficient facts in support of its forum determination, appellate court should not address the issue, but remand to district court to "begin afresh"); *accord, Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43 (3d Cir.1988); *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1308–10 (11th Cir. 1983). On remand, the district court received further evidence, including detailed supplemental affidavits from Sayman as well as several experts hired by the Merciers. The second district court dismissal order was conditioned on (1) acceptance of jurisdiction by the Turkish courts; (2) Sheraton's submission to Turkish jurisdiction; (3) Sheraton's waiver of any statute of limitations defense, and acceptance of the

waiver by the Turkish court; and (4) Sheraton's agreement to satisfy any Turkish court judgment.

## III

## DISCUSSION

 The doctrine of forum non conveniens permits discretionary dismissals on a "case by case" basis, *Royal Bed & Spring Co. v. Famossul Industria E Comercio de Moveis Ltda.*, 906 F.2d 45, 47 (1st Cir.1990), where an alternative forum is available in another nation which is fair to the parties and substantially more convenient for them or the courts. *Howe v. Goldcorp Invest., Ltd.*, 946 F.2d 944, 947 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). The application of the doctrine of forum non conveniens is committed to the sound discretion of the trial court, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981), whose decision will not be reversed absent a "clear abuse of discretion." *Id.; see also Howe,* 946 F.2d at 951; *Royal Bed & Spring Co.*, 906 F.2d at 47–48. But since there is a strong presumption in favor of the plaintiff's forum choice, *id.* at 241, 102 S.Ct. at 258, the defendant must bear the burden of proving *both* the availability of an adequate alternative forum, *see Tramp Oil & Marine, Ltd. v. M/V Mermaid I,* 743 F.2d 48, 50 (1st Cir.1984), and the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum, *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831, 91 L.Ed. 1067 (1947); *Howe,* 946 F.2d at 950 (citing *Piper Aircraft,* 454 U.S. at 259, 102 S.Ct. at 267).

### A. *Forum Availability*

 As we noted in *Mercier II*, an alternative forum generally will be considered "available" provided the defendant who asserts forum non conveniens is amenable to process in the alternative forum. 935 F.2d at 424 (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 506–07, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)); *see also Piper Aircraft,* 454 U.S. at 254 n. 22, 102 S.Ct. at

265 n. 22. There seems to be no question that Sheraton is amenable to process in the Republic of Turkey. Not only does Sheraton conduct substantial business in Turkey (*i.e.*, operation of the Istanbul Sheraton Hotel), but any contracts at issue in the present action were made in Turkey and were to be performed there. *See* Turk. Code Civ.Proc. Art. 10 (Turkish courts competent to hear disputes over contracts made or to be performed in Turkey); Art. 21 (Turkish courts exercise jurisdiction over torts committed within Turkey). Moreover, the 1984 Protocol expressly designates Istanbul, Turkey, as a valid locus for the litigation of disputes arising among these parties, and forum selection provisions have been recognized as a valid basis for jurisdiction under Turkish law. *See generally* T. Ansay, *American–Turkish Private International Law* 61 (Parker School of Foreign and Comparative Law, Columbia University, Bilateral Studies in Private International Law, No. 16) (1966) [*"Columbia Study"*]. Finally, the dismissal of the complaint was expressly conditioned on Sheraton's submission to the jurisdiction of the Turkish courts and on the Turkish courts' exercise of that jurisdiction. We therefore conclude that the Republic of Turkey is an "available" alternative forum for the present action.

## B. *Forum Adequacy*

■ The *adequacy* of the alternative forum is a separate inquiry. *See Piper Aircraft*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22; *In re Air Crash Disaster*, 821 F.2d at 1165. An alternative forum may be inadequate even though the defendant is amenable to process, *Mercier II*, 935 F.2d at 424, if "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all," *Piper Aircraft*, 454 U.S. at 254, 102 S.Ct. at 265; *Howe*, 946 F.2d at 952. For example, an alternative forum is inadequate if it "does not permit litigation of the subject matter of the dispute," *id.* at 254 n. 22, 102 S.Ct. at 265 n. 22; *Industrial Dev. Corp. v. Mitsui & Co.*, 671 F.2d 876, 891 (5th Cir.1982), *vacated and remanded on other grounds*, 460 U.S. 1007, 103 S.Ct.

1244, 75 L.Ed.2d 475 (1983); or the plaintiff demonstrates significant legal or political obstacles to conducting the litigation in the alternative forum, *see Menendez Rodriguez v. Pan Am Life Ins. Co.*, 311 F.2d 429 (5th Cir.1962) (Castro's Cuba unavailable to Cuban political refugees as alternative forum), *vacated on other grounds*, 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964); *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854 (S.D.N.Y.1983) (plaintiff would be executed were he to attempt to litigate in postrevolutionary Iran), *aff'd without opinion*, 767 F.2d 908 (2d Cir.1985).

■ Sheraton was required to establish that the Turkish courts offer an adequate alternative forum for the present action. *See Tramp Oil & Marine*, 743 F.2d at 50; *see also Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir.1991); *Cheng v. Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983); *Schertenleib v. Traum*, 589 F.2d 1156, 1159–60 (2d Cir. 1978); *but see Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 393 (5th Cir.1983) (plaintiff bears burden of proving inadequacy of defendant's proposed alternative forum). The primary contention made by the Merciers in *Mercier II* was that Sheraton had not shown that the Turkish forum was adequate in light of the legal difficulties (risk of arrest) Susan Mercier would encounter were she to return to Turkey to testify, 935 F.2d at 427. Although we concluded that these legal difficulties alone were not sufficient to render Turkey an inadequate alternative forum, *id.*, on remand the district court was directed to consider whether the Turkish courts would decline to receive essential affidavit or deposition testimony from Susan Mercier by reason of her fugitive status. *Id.* As a Turkish criminal court has exonerated Susan Mercier, and vacated the arrest warrant, *Director of Public Prosecutions v. Mercier*, No. 1986/103 (Turkish First Aggravated Felony Court [Kadikoy], July 7, 1988), currently there is no legal or political obstacle to the presentation of Susan Mercier's testimony

in the Turkish courts.[2]

■ Similarly, we reject the contention that the Merciers would be handicapped in vindicating their rights before the Turkish courts due to a "profound bias" against Americans and foreign women. We noted in *Mercier II* that the Merciers had provided no record basis "for us to suspect, much less take judicial notice of, an American woman's patent inability to secure basic justice in the Turkish courts." 935 F.2d at 427. As their offer of proof remained inadequate on remand, it was rightly disregarded by the district court.[3] Moreover, it is not unfair that a plaintiff's conclusory claims of social injustice in the foreign nation where she deliberately chose to live, work, and transact the business out of which the litigation arises should be accorded less than controlling weight in the selection of a judicial forum for the related litigation. *See Mizokami Bros. of Arizona, Inc. v. Baychem Corp.*, 556 F.2d 975, 978 (9th Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978); *Shields*, 508 F.Supp. at 894 n. 4; *cf. Cuba*

*R. Co. v. Crosby*, 222 U.S. 473, 480, 32 S.Ct. 132, 133, 56 L.Ed. 274 (1912) (Holmes, J.) (upholding application of foreign law to plaintiff's tort claim; "it should be remembered that parties do not enter into civil relations in foreign jurisdictions in reliance upon our courts. They could not complain if our courts refused to meddle in their affairs and remitted them to the place that established and would enforce their rights.").

■ In a more substantive vein, our remand in *Mercier II* required the district court to reconsider whether the Mercier claims for breach of contract and tortious interference with contractual relations would be cognizable under Turkish law.[4] On remand, Dr. Sayman submitted a more comprehensive affidavit, setting forth Turkish law. We have reviewed the new Sayman affidavit, and the Turkish Code of Obligations on which it is based. Insofar as we have been able to determine, the affidavit appears to relate an accurate and complete statement of the relevant governing law.[5] The district court did not "clear-

2. Although we are sensitive to any personal trepidation with which Mercier may view her return to Turkey, in light of the fact that her assailant apparently remains at large, we adhere to the misgivings expressed in *Mercier II:* "We ... doubt[ ] that Susan Mercier's *personal* difficulties with the Turkish system—as opposed to a showing of Turkish justice's systematic inadequacy—can provide an appropriate basis for a finding that Turkey is an inadequate forum." 935 F.2d at 426–27 (emphasis added); *cf. Shields v. Mi Ryung Constr. Co.*, 508 F.Supp. 891, 895 (S.D.N.Y.1981) (alternative (Saudi) forum adequate notwithstanding plaintiff's asserted fears for personal safety).

3. On remand, the Merciers presented the affidavit of an American professor, relating her impressions of the Turkish legal system and recounting her personal teaching experiences in the Republic of Turkey during the periods 1965–1966 and 1980–1982. The district court did not abuse its discretion in ruling the affidavit irrelevant to the issues in the present case. The affiant described her experiences with the Turkish educational system, not its legal system. The experiences occurred as many as 25 years ago, and most recently a decade ago while Turkey was governed by a military regime. Most importantly, the affidavit addresses the social, not the *legal,* status of women in Turkey. With respect to the latter point, we would note that Susan Mercier's vindication *in absentia* by the

Turkish criminal court, following her dispute with a Turkish male assailant, *see Director of Public Prosecutions v. Mercier, supra,* would at least tend to undercut her conclusory assertion that "injustice [is] prevalent in the Turkish legal system when a foreigner (especially a woman) opposes a Turkish man." *Mercier II,* 935 F.2d at 427.

4. The initial Sayman affidavit was found inadequate to establish Turkey as an adequate alternative forum. 935 F.2d at 425–26 (citing *Lacey,* 862 F.2d at 43–44). The initial affidavit stated:

The courts of Istanbul are competent to hear the claims stated in the complaint filed by the Merciers in the above-captioned proceeding. In such a civil proceeding before our courts the litigants are guaranteed the same sort of procedural safeguards I understand they enjoy in the United States. They are entitled to be heard, to present evidence, and to cross-examine their opponents' witnesses. The judgment of the trial court is subject to review by an appellate tribunal.... Our constitution grants standing to foreign nationals, such as the Merciers, to prosecute such commercial claims in our courts.

5. Sayman's affidavit represents that an action for breach of contract would be recognized under Articles 96–108 of the Turkish Code of Obligations, and that an action for tortious interfer-

ly" abuse its discretion in accepting the Sayman affidavit as a correct statement of Turkish law. *See, e.g., Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991) (citing *Cheng,* 708 F.2d at 1410–11) (moving party may demonstrate adequacy of alternative forum's law through affidavits and declarations of experts); *accord, Zipfel v. Halliburton Co.,* 832 F.2d 1477 (9th Cir.1987), *cert. denied,* 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 921 (1988).

■ For the most part, the remaining objections to the adequacy of the Turkish forum were satisfactorily addressed by the conditions imposed in the order of dismissal.[6] *Cf. Piper Aircraft,* 454 U.S. at 257 n. 25, 102 S.Ct. at 267 n. 25; *Ahmed v. Boeing Co.,* 720 F.2d 224, 225 (1st Cir.1983) (conditional dismissal sufficient to cure alleged inadequacies in alternative available forum). Although the Merciers contend that the district court should have conditioned dismissal on Sheraton's provision of document translations, *see Dahl v. United Technologies Corp.,* 632 F.2d 1027, 1031 (3d Cir.1980), we do not agree. Unlike the situation in *Dahl,* where the injured plaintiffs had no control over the place where the instrument of their injury was manu-

factured or designed, in the present case the Merciers intentionally bound themselves to a contract requiring performance in Turkey, thereby plainly assuming the obvious risk that document translations might be necessary in any future contract dispute.

■ We are unable to accept two additional proposals made by the Merciers, which contemplate, in effect, that Turkish procedure be brought more in line with the procedures utilized in American courts, as a condition of dismissal. The first proposal—an amorphous request that Sheraton be required to "facilitate discovery" in the foreign forum—was not raised below, either before or after remand, and must be rejected here. *See Kale v. Combined Ins. Co.,* 861 F.2d 746, 755 (1st Cir.1988); *J & S Constr. Co. v. Travelers Indemn. Co.,* 520 F.2d 809, 809 (1st Cir.1975). Turkish courts have their own procedures for compelling discovery. *See, e.g.,* Article 258/I of the Turkish Code of Obligations (compulsory process available to enforce attendance of witnesses). The case law is clear that an alternative forum ordinarily is not considered "inadequate" merely because its courts afford different or less generous discovery procedures than are available un-

ence with contractual relations could be recognized under the Code's Article 41 (requiring indemnity by "one who knowingly causes damage to another, as a result of an immoral action"). Sayman also indicated that the statute of limitations in contract actions is ten years, and that Turkish courts would accept a waiver of the one-year statute of limitations for tort actions.

The Merciers responded with a lengthy affidavit from their own expert, A. Nusret Haker, apparently admitting the availability of an action for breach of contract under Turkish law, but challenging Sayman's assertion that the Merciers' claim for tortious interference with contractual relations could be heard under Article 41. According to Haker, Article 41 defines a "catch-all type of tort provision" which applies principally to non-contractual obligations, and does not "perfect[ly] fit" the claim for tortious interference with contractual relations. Haker Affidavit at ¶ 6(b). Haker conceded that a Turkish court might utilize Article 41 to facilitate a tort claim under Article 98/II (stating that "liability provisions of tortious acts are also applicable, by reference, to actions constituting breach of contract"), but considered this "highly unlikely." *Id.* Sayman submitted a detailed

affidavit in response, criticizing Haker's challenge to Sayman's analysis of Article 41.

The district court concluded that "the Sayman affidavit [was] more comprehensive, more reliable, based on more current information and based on more familiarity and more experience with the system than Mr. Haker's." We agree. However, even if Haker's affidavit were to be fully credited, we think it would not amount to a showing that "the remedy provided by the alternative forum [Turkey] is *so clearly inadequate or unsatisfactory that it is no remedy at all."* *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. at 265 (emphasis added); *see also Evangelical Alliance Mission,* 930 F.2d at 768–69.

6. For example, the district court conditioned dismissal on Sheraton's affirmative waiver of all statute of limitations defenses:

> The defendant shall not assert any defense based upon any statute of limitations but shall affirmatively waive any such defense ... provided that the Courts of the Republic of Turkey shall give full force and effect to such waiver.

Sheraton asserts no claim that the waiver requirement is overbroad.

der American rules. *See Evangelical Alliance Mission,* 930 F.2d at 768 (Japanese forum held adequate although discovery procedures were "not identical to those in the United States"); *Zipfel,* 832 F.2d at 1484 (Singapore forum held adequate available forum although depositions were allowed only in certain circumstances); *In re Union Carbide Gas Plant Disaster,* 809 F.2d 195, 205 (2d Cir.), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987) (Indian forum held adequate although Indian discovery rules were more limited than United States rules; Indian courts could voluntarily accept American rules, but this would not determine propriety of dismissal by American court); *see generally Howe,* 946 F.2d at 946 ("small differences in standards and procedural difficulties ... are beside the point").

■ The second proposed condition, requiring Sheraton to waive the "cost bond" commonly imposed on foreign litigants in Turkish courts, presents a somewhat closer question. It has been noted that an action should not be dismissed on forum non conveniens grounds without first considering "the realities of the plaintiff's position, financial or otherwise, and his or her ability as a practical matter to bring suit in the alternative forum." *Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339 (8th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984) (vacating transfer to Cayman Islands, based in part on indigent plaintiff's inability to post "cost bond"); *see also Macedo v. Boeing Co.,* 693 F.2d 683, 688, 690 (7th Cir.1982) ("cost bond" requirement may be given weight in forum balancing process); *but see Nai–Chao v. Boeing Co.,* 555 F.Supp. 9, 16 (N.D.Cal.1982), *aff'd,* 708 F.2d 1406 (9th Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983) ("filing fee" amounting to 1% of recovery sought held not relevant to adequacy of foreign forum). On the other hand, we perceive no abuse of discretion in the district court ruling that the burden presented by the "cost bond"

requirement did not rise to a level which would render the Turkish forum "so clearly inadequate or unsatisfactory that [it effectively offered] no remedy at all." *Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. at 265.

The Merciers are not indigent, nor can the Turkish bond requirement, though substantial, be considered excessive in the circumstances.[7] Its function is to cover court costs and to ensure the eventual recovery of any damages awarded against the plaintiff. It therefore safeguards the harmonious operation of Turkish procedural rules, such as the "cost-shifting" rule requiring a losing litigant to pay the legal fees and costs of the winner. Although such broad-scale "cost-shifting" is not in tune with the "American rule," the disparity provides an insufficient basis for finding that the district court abused its discretion. *Cf. id.* (holding that unfavorable change in forum law is insufficient to preclude forum non conveniens dismissal).

■ By the same token, the Merciers reasonably sought to condition the dismissal order on assurances by Sheraton that witnesses and evidence be made available in Turkey. Sheraton's corporate headquarters is in Massachusetts. It seems to us reasonable that the Merciers' choice of the Massachusetts forum was prompted at least in part by their interest in compelling production of Sheraton records and subpoenaing Sheraton witnesses. In these circumstances, we believe it appropriate to condition the order of dismissal on the availability, in the Turkish forum, of witnesses and evidence within Sheraton's control in Massachusetts. *See Piper Aircraft,* 454 U.S. at 257 n. 25, 102 S.Ct. at 267 n. 25; *Vaz Borralho,* 696 F.2d at 394 (remanding with direction to impose further condition on dismissal requiring defendants' agreement to make all necessary witnesses and documents available in alternative forum); *see also de Melo v. Lederle Labs.,* 801 F.2d 1058, 1063 (8th Cir.1986) (upholding conditional dismissal from original forum—

---

7. According to the parties' experts, typically the plaintiff's bond is set by the Turkish courts at 15% of the recovery sought, and is a recoverable cost in the event the plaintiff prevails. Shera-

ton's expert, Dr. Sayman, suggests that a Turkish court might waive the bond requirement, or reduce it to as little as 3% of the monetary recovery sought.

where corporate defendant's principal place of business was located—on defendant's agreement to make documents and witnesses available in alternative available forum); *Watson v. Merrell Dow Pharmaceuticals, Inc.*, 769 F.2d 354, 356 (6th Cir.1985) (same).

#### c. *Forum Convenience*

■ The availability of an adequate alternative forum is but the first step in the forum non conveniens analysis. The more complicated inquiry is whether the alternative forum is sufficiently more convenient for the parties as to make transfer necessary to avoid serious unfairness. *Howe*, 946 F.2d at 950 (citing *Piper Aircraft*, 454 U.S. at 259, 102 S.Ct. at 267).

■ Well-established "public interest" and "private interest" criteria guide the trial court determination as to the relative convenience of an alternative forum. *See Gulf Oil v. Gilbert*, 330 U.S. at 508-09, 67 S.Ct. at 843. The "private interest" criteria include the comparative convenience of the parties' access to sources of proof; the availability of compulsory process and the cost of securing the attendance of witnesses; the possibility of a view of the premises, if a view would be appropriate; and an evaluation of "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 508, 67 S.Ct. at 843. The "public interest" criteria include the administrative difficulties resulting from court congestion in the plaintiff's chosen forum; the "local interest in having localized controversies decided at home"; the interest in having the trial of a case conducted in a forum that is at home with the governing law; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of imposing jury duty on citizens in an unrelated forum. *Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6.

■ In weighing these considerations, the trial court must favor the plaintiff's choice of forum: "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 509, 67 S.Ct. at 843. The deference accorded the plaintiff's choice of forum is enhanced when the plaintiff has chosen a forum in which the defendant maintains a substantial presence, *see Schertenleib*, 589 F.2d at 1164; *see also Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 608 (3d Cir.1991); *Mutual Export Corp. v. Westpac Banking Corp.*, 742 F.Supp. 161, 163 (S.D.N.Y.1990), and when the plaintiff is an American citizen who has selected an available American forum, *Piper Aircraft*, 454 U.S. at 256 n. 23, 102 S.Ct. at 266 n. 23; *see also Hoffman v. Goberman*, 420 F.2d 423 (3d Cir.1970); *Mobil Tankers Co. v. Mene Grande Oil Co.*, 363 F.2d 611, 614 (3d Cir.1966), *cert. denied*, 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966).

■ Yet no absolute deference is due an American plaintiff's selection of an available American forum in an action against an American defendant. *See Piper Aircraft*, 454 U.S. at 255 n. 23, 102 S.Ct. at 266 n. 23. Forum non conveniens is a "flexible, practical" doctrine, *Howe*, 946 F.2d at 950, not subject to ritualistic application; and "[a]lthough 'a defendant must meet an almost impossible burden in order to deny a citizen access to the courts of this country,' the cases demonstrate that defendants frequently rise to the challenge." *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1449 (9th Cir.1990) (quoting *Mizokami Bros. of Arizona, Inc. v. Baychem Corp.*, 556 F.2d 975, 977 (9th Cir.1977)); *Evangelical Alliance Mission*, 930 F.2d at 767; *Alcoa S/S Co. v. M/V Nordic Regent*, 654 F.2d 147, 152 (2d Cir.) (en banc), *cert. denied*, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980). Moreover, as we have noted, a trial court's determination to transfer a case to an available foreign forum is reviewable only for a clear abuse of its discretion.

■ The Merciers assert that the district court abused its discretion by (1) improperly minimizing the importance of their interest in an American forum; (2) continuing to treat the insubstantial connections between the Commonwealth of Massachu-

setts and the present dispute as a relevant factor in its forum inquiry; (3) assigning excessive weight to its inability to compel the testimony of Deliveli, a Turkish national; (4) assigning insufficient weight to the litigation activity already conducted on the merits in the American forum; (5) exaggerating the difficulties in applying Turkish law; (6) overstressing the docket congestion in the forum court; and (7) overemphasizing the importance of the forum selection clause in the 1984 Protocol.

1. American Plaintiffs' Interest in American Forum

The district court expressly noted that the Merciers are American citizens, and acknowledged that the court "would like to resolve [this] matter between America[n] citizens." Thus, the district court was cognizant of the strong presumption favoring the American forum selected by American plaintiffs. Moreover, the district court's extended discussion of the factors militating in favor of a transfer indicate that the court was fully aware of the considerable quantum of evidence required to overcome the presumption. *See, e.g., Gulf Oil*, 330 U.S. at 509, 67 S.Ct. at 843. We are satisfied that the district court neither failed to consider the Merciers' American citizenship nor assigned their choice of an American forum perfunctory weight. *See Mercier II*, 935 F.2d at 423.

2. Connection Between the Dispute and the Massachusetts Forum

After noting the presumption of forum adequacy which arises as a result of the American citizenship of the parties, the district court intimated that the attenuated connection between the parties' dispute and the Massachusetts forum militated in favor of dismissal. *See* District Court Opinion at 24 ("Except for the fact that Susan Mercier and George Mercier are American citizens, ... this is not a local controversy."). The Merciers argue that the district court disregarded our admonition in *Mercier II*, that "the Merciers' *United States* citizenship and residence—plus Sheraton International's similar citizenship and residence— ... make this a controversy local to the United States, if not necessarily to Massachusetts." 935 F.2d at 429 (emphasis in original). We think that the Merciers misapprehend *Mercier II*.

Contrary to their understanding, *Mercier II* did not state that a district court could not recognize, as a factor to be considered in its forum non conveniens analysis, the attenuated connection between the matter in litigation and the particular forum selected within the United States. Rather, we pointed out that the connection between the matter in litigation and the *particular forum* within the United States may not wholly *supplant* the dominant transnational comparison required where "the choice facing the district court [is] between two *countries*." *Id.* at 429–30 (emphasis in original). Provided adequate recognition is accorded "the substantial public interest in providing a convenient United States forum for an action in which all parties are United States citizens and residents," *id.* at 430, the trial court may weigh, as a subsidiary consideration, any attenuated connection between the particular United States forum and the matter in litigation. *See, e.g., de Melo*, 801 F.2d at 1063; *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1336 (9th Cir.1984), *cert. denied*, 471 U.S. 1066, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985); *see generally Pain v. United Technologies Corp.*, 637 F.2d 775, 792 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981) ("courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it; [and] may legitimately encourage trial of controversies in *the localities* in which they arise") (emphasis added).

3. Witness Availability

In the district court's view, a very important "private interest factor" pointing to dismissal was the inability of any American court to compel the testimony of Fethi Deliveli, the Merciers' Turkish partner, who played a significant role in negotiating the two written agreements underlying the

Merciers' claims.[8] *See* Dist.Ct.Opin. at 22–23. In *Mercier II*, we explicitly recognized the importance of Deliveli's availability: "While the Merciers have provided a long list of [American] witnesses who appear to have been party to one or two negotiating sessions, none appears to have been as central to the negotiations as Deliveli." 935 F.2d at 428. Moreover, it seems most likely that Deliveli's credibility would be pivotal to any judicial resolution of the factual issues at the root of the parties' dispute. Thus, the fact-finder's opportunity to evaluate Deliveli's credibility on the basis of in-person testimony could be crucial to a reliable resolution of these factual disputes. In these circumstances, deposition testimony and letters rogatory, even if available to the American court, would be less than satisfactory substitutes for in-person testimony. *See Howe*, 946 F.2d at 952 ("compulsory process would seem to be especially important where ... subjective intent [is an] element[ ] of the claim.").

██ In its initial ruling the district court considered the unavailability of Deliveli and other Turkish witnesses to be "a problem in theory only," as "there [was] no evidence ... that [Sheraton] ha[d] ever asked these witnesses to provide evidence, let alone that they ha[d] ... refused to do so." *Mercier I*, 744 F.Supp. at 385. On remand, however, the district court concluded that Deliveli's unavailability as a witness threatened "serious unfairness" at any American trial. *See Mercier II*, 935 F.2d at 424. The significance of Deliveli's role, *inter alia*, in negotiating and drafting the agreements confutes the Merciers' contention that Sheraton was required to demonstrate the content of Deliveli's testimony or his unavailability absent compulsory process. As other courts have recognized, there is no "blanket rule" that a defendant affirmatively demonstrate, by affidavit, the unavailability of a foreign witness and the

significance of the witness's testimony. *See Empresa Lineas Maritimas Argentinas v. Schichau–Unterweser, A.G.*, 955 F.2d 368, 372 (5th Cir.1992) (citing *Baris*, 932 F.2d at 1550); a blanket rule "would tend to inflict an impossible burden on defendants who are seeking dismissal for the very reason that they cannot compel evidence, including the evidence necessary to argue for dismissal." *Empresa Lineas*, 955 F.2d at 372 (citing *Piper Aircraft*, 454 U.S. at 258, 102 S.Ct. at 267). Under the terms of the remand order in *Mercier II*, 935 F.2d at 430—requiring that the factors militating for and against dismissal be rebalanced—there was no clear abuse of discretion in the district court's finding that the unavailability of Deliveli's testimony would result in "serious injustice" in the event the case were tried in the District of Massachusetts.

### 4. Litigation Activity in Chosen Forum

As a basis for their contention that "the presumption against dismissal on the grounds of forum non conveniens [has been] greatly increase[d]," *Lony*, 935 F.2d at 614, the Merciers point to litigation activity relating to the merits, *id.* *See also Gates Learjet*, 743 F.2d at 1335 (citing, as a relevant "private interest factor," that "parties were *ready for trial* when [the court] dismissed the complaint for forum non conveniens") (emphasis added); *but see Empresa Lineas*, 955 F.2d at 372 (rejecting argument that district court acted unreasonably in dismissing case filed eight years before, in which third-party claim by moving plaintiff was filed two years earlier). However, the only "substantial merits discovery" identified by appellants (except for that incident to the dismissal motion itself) consisted of the Susan and George Mercier depositions taken by Sheraton in April and May 1990.

---

8. Deliveli was a principal stockholder in Lidya, the Turkish corporation through which the Merciers initially hoped to lease space and operate the casino. On Lidya's (and the Merciers') behalf, Deliveli signed the 1984 Protocol defining the parties' prospective roles in the operation of the casino. He was also a party to the negotia-tions and a signatory to the earlier Memorandum of Understanding, which outlined the steps required for bringing the casino into existence. It seems likely that he may have been a necessary party to any attempts to obtain the required permits from the Turkish government.

For present purposes, we would observe that the merits activity in this case simply never approached the level which was held to preclude dismissal in *Lony* or to weigh against dismissal in *Gates*. The forum non conveniens dismissals in those cases were not sought until several years after the defendants filed their answers and the dismissal motions were based on "allegedly new facts uncovered in discovery." 935 F.2d at 614.[9] Moreover, we think the "merits activity" in *Lony* substantially affected the very factors of relative convenience, such as "access to sources of proof" and "attendance of witnesses," which the Supreme Court has identified as crucial to the forum non conveniens inquiry. *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. In our view, these factors alter the balance in favor of dismissal in the present case.

### 5. Difficulties with Turkish Law

The district court also adverted to the difficulty of applying Turkish law.[10] As appellants note, this factor is not "dispositive." *See Piper Aircraft*, 454 U.S. at 260 n. 29, 102 S.Ct. at 268 n. 29. Rather, "the task of deciding foreign law [is] a chore federal courts must often perform," *Manu Int'l, S.A. v. Avon Products, Inc.*, 641 F.2d

62, 68 (2d Cir.1981), and the difficulties associated with the application of foreign law should not be ascribed "undue importance." We do not think the district court assigned dispositive weight to the problem of applying foreign law, but cited it as one of several factors "counseling dismissal." *Mercier II*, 935 F.2d at 428. *See also Piper Aircraft*, 454 U.S. at 260, 102 S.Ct. at 268; *cf. Travelers Indem. Co. v. S/S Alca*, 710 F.Supp. 497, 501–02 (S.D.N.Y.), *aff'd without opinion*, 895 F.2d 1410 (2d Cir. 1989) (difficulty of applying Turkish law cited as partial basis for dismissal).

### 6. Docket Congestion

The district court found that Turkish civil courts are significantly less congested than the civil docket of the United States District Court for the District of Massachusetts, and that the public and private interests in obtaining an expeditious resolution of the parties' dispute therefore favored a Turkish forum. The district court relied on caseload statistical reports[11] and on the Sayman affidavit, which attests that a lawsuit of this nature could be heard by the Turkish Court of Commerce in approximately eighteen months, excluding any appeal.[12] We conclude that the district

---

9. The activity which had taken place to that point in *Lony* included not only limited discovery on a prior, unsuccessful forum non conveniens motion, but also six months of continuous discovery on the merits; document production amounting to several thousand pages; substantial exchanges of interrogatories; translation of documents from German into English; and the depositions of at least five witnesses, including one from overseas. *Lony*, 935 F.2d at 613. Furthermore, the trial court in *Lony* had achieved a high degree of familiarity with the litigation.

10. Although applicable Turkish law is patterned on familiar European models, notably the Swiss Code of Obligations, and has been translated into English, *see Swiss Federal Code of Obligations with Turkish Alterations* (G. Wettstein ed. 1928), it is still subject to Western judges' general lack of familiarity with civil law principles. Moreover, practical difficulties are likely to be encountered in applying Turkish law to a dispute in American courts by reason of the fact that many treatises on Turkish law are unavailable in English translation, *see* O. Oehring, *Bibliographie zum turkischen Recht und den internationalen Beziehungen der Turkischen Republik* (1982), T. Ansay, "Law of Obligations," *in Intro-*

*duction to Turkish Law*, (T. Ansay & D. Wallace eds.; 3d ed. 1987), and that almost no Turkish court decisions are available in English translation, *id.* Although Turkish court decisions are not binding to the same extent as American court decisions, "much attention is paid to them by Turkish writers," and "the lower courts give consideration to the previous decisions of the Supreme Court [Yargitay]." *Columbia Study*, at 12.

11. The Federal Court Management Statistics submitted by Sheraton showed that as of June 30, 1990, 30.8% of civil cases in the District of Massachusetts had been pending for more than three years, by far the highest in the First Circuit, and approximately 300% higher than the national district court average of 10.4%. Moreover, the district court pointed out that diversity cases typically are placed on the slowest track. Priority is given to criminal cases under the Speedy Trial Act and to civil cases invoking federal question jurisdiction.

12. The Merciers' expert challenged Sayman's representations, asserting that this case would take approximately three years to be "fully

court's comparative analysis on remand met the mandate in *Mercier II*, 935 F.2d at 428–29, directing "a *comparative* determination of where the case can most quickly be resolved, rather than simply rely[ing] on the state of [the district court's] own docket" (emphasis added); *see also Gates Learjet*, 743 F.2d at 1337 ("real issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket").

### 7. Forum Selection Clause

■ The Protocol signed in 1984 by Sheraton and Deliveli (on behalf of Lidya, in which the Merciers held an important interest) contained a forum selection clause, providing that "the agreement will be governed by Turkish laws and the jurisdiction will [sic] Istanbul, Turkey."[13] A mutual forum selection clause is a factor to be considered in the forum non conveniens analysis. *Royal Bed & Spring*, 906 F.2d at 51, 52.

The Merciers protest that the district court assigned excessive weight to the forum selection clause. We disagree. Although their signatures do not appear on the document, the Protocol was signed in behalf of the Merciers and Lidya by Deliveli, and pertained to the same business transaction which is at issue in the present action. Notwithstanding its apparent typographical omission, the clause is most naturally read to indicate the parties' choice of Istanbul, Turkey, as the forum for litigating whatever disputes might arise out of their business relationship. Indeed, the Merciers' lawsuit is predicated in part on the validity of the Protocol containing the forum selection clause. Moreover, the fact that Sheraton asserts that the Merciers breached the substantive terms of the Protocol does not alter the appropriateness of

honoring the parties' choice of an adequate and available forum for resolving their substantive dispute.

### III

### CONCLUSION

For the foregoing reasons, the district court order of dismissal is modified to include the following condition:

> Sheraton, its subsidiaries and affiliates, shall make available in the Republic of Turkey all evidence within their control, including testimony of their officers and employees, at least to the extent that such evidence would have been available to plaintiffs in the district court proceedings in the District of Massachusetts.

*The order of dismissal, as modified, is affirmed. So ordered.*

---

tried" in Turkey. Haker Affidavit, at A–230. As noted, however, the district court supportably declined to credit Haker's affidavit. *See supra* note 5 and accompanying text.

**13.** Forum selection clauses have long been utilized in commercial transactions between citizens of the United States and Turkey. *See, e.g.,* *Travelers Indemnity Co. v. S/S Alca*, 713 F.Supp. 129, 131–132 (S.D.N.Y.1989); *Falcoal, Inc. v. Turkiye Komur Isletmeleri Kurumu*, 660 F.Supp. 1536 (S.D.Tex.1987) (forum selection clause naming Turkey); *Konstantinidis v. S/S Tarsus*, 248 F.Supp. 280, 281 (S.D.N.Y.), *aff'd*, 354 F.2d 240 (2d Cir.1965) (arbitration clause designating

Turkish forum and prescribing application of Turkish law).